**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF
FLORIDA BROWARD DIVISION**
Case No.: _____

PANGEA MERX, LLC, a Florida Limited
Liability Company,

          Plaintiff,

**v.**

C.B.I.SPA, an Italian corporation;
ONLYMOSO HARVEST, LLC, a Florida
Limited Liability Company; ONLYMOSO
U.S.A. CORP, a Florida corporation;
ONLYMOSO U.S.A. MARKETING, LLC, a
Florida Limited Liability Company;
FABRIZIO PECCI; and ROBERTO
SEMINARA,

          Defendants.

_____/

**JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW Plaintiff, PANGEA MERX, LLC ("Plaintiff" or "PANGEA"), by and through its undersigned counsel, complains of Defendants C.B.I.SPA; ONLYMOSO HARVEST, LLC; ONLYMOSO U.S.A. CORP; ONLYMOSO U.S.A. MARKETING, LLC; FABRIZIO PECCI; and ROBERTO SEMINARA ("Defendants") conduct, and alleges upon information and belief as follows:

## NATURE OF THIS ACTION

1.     PANGEA seeks monetary damages under federal and state law claims arising from Defendants' breach of contract, fraud, civil conspiracy to commit fraud, unjust enrichment, and violation of privacy.

2.      As described in more detail below, the parties entered into an International Sales and Distribution Agreement (referred herein as the "Agreement" and incorporated to this Complaint as Exhibit "A"), through which PANGEA would be the exclusive distributor of Defendants' bamboo-based food products in the United States (U.S.A.).

3.      Defendants breached the Agreement by providing false information, including the fact that Defendants' products where not compliant with the applicable U.S. administrative agencies' requirements for imported food products; failing to disclose material facts such as technical specifications; and failing to provide PANGEA with marketable products as per the terms of the Agreement.

4.      As of the date of this Complaint, Defendants have failed to act according to their duties.

5.      As of the date of this Complaint, and after having attended a mediation pursuant to the terms and conditions of the Agreement, Defendants have failed to reimburse Pangea for the amounts invested in furtherance of said Agreement.

6.      Moreover, Defendants continue to work in the relevant field (bamboo products' commercialization) and keep using PANGEA'S property, including marketing material and copyrighted images, which were produced at PANGEA'S expense in furtherance of the Agreement.

7.      Further, this case concerns Defendants' continued wrongful and unauthorized use of PANGEA'S promotional material, as well as the personal image and personal name of PANGEA'S officers.

8.      As of the date of this Complaint, Defendants continue to use the images and names of PANGEA'S officers on the Internet and through online commerce with the manifest intent of soliciting investors for projects related to Defendants' products and services.

9.      As a result of Defendants' actions, PANGEA has sustained a loss in excess of $480,070.00, which represents money invested due to Pangea's reliance on Defendants' assurances, liquidated damages pursuant to the Agreement between the parties, in addition to royalties for the unauthorized use of the images of PANGEA'S officials, as well as punitive and exemplary statutory damages in an amount to be determined at trial.

### JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 1332 (a) as these claims arise under diversity Jurisdiction and Plaintiff seeks damages that exceed $75,000.00.

11.     This Court has supplemental jurisdiction over the pendant state law claims pursuant to 28 U.S.C. § 1367(a).

12.     Defendants are subject to personal jurisdiction in the State of Florida and this District because they reside in the State of Florida. Additionally, Defendants are subject to personal jurisdiction in the State of Florida and this District because: (a) Defendants entered into a forum selection clause that identifies this District as the exclusive district for resolution of the disputes between the parties; (b) Defendants have sold products into the State and this District; (c) Defendants have caused tortious injury to PANGEA within the State and this District; (d) Defendants practice the

unlawful conduct complained of herein, in part, within the State and this District; (e) Defendants regularly conduct or solicits business within the State and this District; (f) Defendants regularly and systematically direct electronic activity into the State and this District with the manifest intent of engaging in business within the State and this District, including the sale and/or offer for sale to Internet users within the State and this District; and (g) Defendants enter into sales contracts with residents of the State and this District.

13. Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.

## **PARTIES**

14. Plaintiff PANGEA MERX, LLC is a duly organized Florida Limited Liability Company.

15. Defendant C.B.I.SPA. is an Italian corporation dedicated to the commercialization of bamboo, it operates in Europe under the trade names OnlyMoso Italy, OnlyMoso Spain, OnlyMoso France, OnlyMoso China, OnlyMoso Portugal and Consorzio Bambu Italia. (See Exhibit "B").

16. Defendant ONLYMOSO HARVEST, LLC is a duly organized Florida Limited Liability Company. It commercializes bamboo products in the United States of America under the trade name OnlyMoso and advertises investment opportunities as a subsidiary of OnlyMoso and its family of international subsidiaries.

17. Defendant ONLYMOSO U.S.A. CORP is a duly incorporated Florida corporation.

18.     Defendant ONLYMOSO U.S.A. MARKETING, LLC is a duly registered Florida Limited Company whose manager and authorized member is ROBERTO SEMINARA.

19.     Defendant FABRIZIO PECCI, ("PECCI") is an Italian citizen residing in Italy, who commercializes bamboo products through his company C.B.I.SPA. and its international subsidiaries OnlyMoso Italy, OnlyMoso Spain, OnlyMoso France, OnlyMoso China, and OnlyMoso Portugal. PECCI, was introduced to PANGEA as the responsible party and owner of the OnlyMoso subsidiaries and their projects.

20.     Defendant ROBERTO SEMINARA ("SEMINARA") is a resident of Broward County, Florida and the manager and authorized member of ONLYMOSO U.S.A. MARKETING, LLC.

## THE NEGOTIATION

21.     In 2017, PANGEA, through its principals, the Sosas, met Defendant, SEMINARA, when he rented one of the Sosas' commercial properties.

22.     On several occasions during the last months of 2017, SEMINARA offered PANGEA an investment opportunity to commercialize "Bambita" products, which are Italian bamboo-based food products, in Latin America.

23.     On or around January 10, 2018, PANGEA decided to entertain the idea of entering into a distribution agreement of said products in Latin America and started working on establishing connections for potential channels of distribution with its business partners in Latin America.

24.     On or about January 10, 2018, PANGEA and Defendant ONLYMOSO HARVEST LLC executed an Non Disclosure Agreement ("NDA") to further formalize the

negotiations.

25.    On or about May 3, 2018, PANGEA started receiving detailed information about the investment opportunity from the Defendants.

26.    On or about September 25, 2018, PANGEA received a presentation with pricing information from Defendant, SEMINARA.

27.    On or about January 30, 2019, and pursuant to the negotiations with the Defendants, PANGEA purchased the URL: Bambita.com.

28.    On February 5, 2019, PANGEA, through its principals, the Sosas, attended a meeting with SERMINARA and FABRIZIO PECCI wherein PECCI was introduced to PANGEA as the owner and representative of the Consorzio Bambu Italia ("C.B.I.S.PA.").

29.    PECCI showed PANGEA his project "Onlymoso", its website, data, photos and videos of his facilities and plantations in Italy. During the February 5th meeting, PECCI indicated that it was more suitable to market the products in the U.S.A., as opposed to Latin America, because Onlymoso was approved to enter and commercialize products in the U.S.A..

30.    During said February 5, 2019 meeting, PANGEA agreed to abandon all the preliminary work they had done in Latin America to focus exclusively on the U.S.A. market.

**THE INTERNATIONAL SALES AND DISTRIBUTION AGREEMENT**

31.    On March 16, 2019, the Parties finalized and executed a contract of exclusivity titled International Sales and Distribution Agreement (the "Agreement"). In Section 5.10(g) of the Agreement, the Manufacturer (i.e. Defendants) confirmed it had

obtained and maintained FDA approval for the facilities.

32.     Section 3.4 of the Agreement also set forth a probationary period to last until December 31, 2019, during which the Defendants would assess PANGEA'S capability to distribute the products and satisfactory serve Defendants' existing clients in the Territory.

33.     Furthermore, Section 3.4.1 of the Agreement included a clause granting Restitution Damages for cancellation during the Probation Period, which stated as follows:

> If Manufacturer decides to cancel the Probation Period without cause while Distributor has duly performed, Manufacturer shall restore Distributor's position with due compensation in an amount equal to the out of pocket investment incurred by Distributor to advance this business opportunity, plus the cost of the existing inventory at the value p[aid by Distributor (including, but not limited to, product value, logistic cost, import duties and additional fees incurred by handling the product) plus an additional fifteen percent (15%) of the total cost as restitution for intangible cost."

34.     Defendants breached the Agreement during the Probation Period as they did not provide marketable products for PANGEA to distribute.

35.     The Defendants delivered certain products that did not meet U.S.A. food regulations and presented the following issues:

1.  **Poor Storage**: Before PANGEA obtained possession of the products, they were stored in a nursery, exposed to the sun and possible contaminants (some of the jars, in fact, contained insects).

2.  **Failure to meet Foreign Supplier Verification Program "FSVP"**: The FSVP requirement was never completed by Onlymoso, even though compliance with this program was one of the reasons why PECCI pushed

to re-route the project to the U.S.A. as opposed to Latin America.

3. **Labels with errors**: The labels have incorrect nutritional information; for instance, the list of ingredients is incorrect.

36.     PANGEA made additional orders, however, it did not receive any products and was not able to make any sales during the Probation Period.

37.     In order to the mitigate its damages and in an attempt to make the delivered products marketable in the U.S.A., PANGEA retained the following professionals:

1. **Kinetic 12**: Consulting Agency hired to organize, perform and analyze marketing focus groups.

2. **US Import agent**: Company hired to create new label reviews, label claims, FSVP and the nutritional fact panels.

3. **MDO Partners (Richard Montes and Lisa Capote) Compliance Lawyers**:  Lisa focuses her practice on regulatory compliance for the life sciences and food industries. They were retained to review compliance of the products imported by Onlymoso from Italy.

38.     In a last desperate effort to save the project, Alberto Sosa, the managing shareholder of PANGEA, traveled to Italy from July 20 to July 30, 2019. The Defendants made promises and assurances that they would correct the problems and cooperate. At this point, PANGEA had invested a substantial amount of money, so it gave the Defendants an opportunity for the remaining months of the Probation Period.

39.     The total amount invested by PANGEA during the Probation Period was approximately $418,000.00. Pursuant to section 3.4.1, Plaintiff is entitled to receive the amount invested plus the additional 15% as restitution for intangible cost, in addition to

other damages awarded by this Court.

## POST BREACH CONDUCT

40.    The Defendants obtained the FSVP approval on November 27, 2019. However, the relationship between the Parties had deteriorated and work under the Agreement was deemed not feasible.

41.    Plaintiff also discovered that the Defendants had engaged in activities that indicated their intent to continue commercializing the products in the U.S.A., benefiting from PANGEA'S investment. PANGEA was defrauded by Defendants, as the Defendants utilized PANGEA'S efforts to get the Bambita products approved in the U.S.A. and get their products compliant in the U.S.A. market, with the intention to utilize PANGEA'S efforts and then distributing the contracted product without PANGEA.

42.    By December 2019, when the Defendants had received notice of this dispute, C.B.I.S.P.A filed for trademark registration of the mark "Bambita" with the USPTO under serial Nos. 88716013; and 88400620, which developed into registrations Nos.: 6094995; and 6005561. C.B.I.S.P.A used PANGEA'S photos, label and design as specimen for trademark application serial No.: 88716013.

43.    As recently as March 25, 2021, ROBERTO SERMINARA, filed for trademark registration of the mark "Bamboopreneurs" with the United States Patent and Trademark Office under statutory basis 1(b), or intent to use.

44.    On or around March 25, 2021, SERMINARA purchased a domain under that "Bamboopreneurs" mark, which is connected to a website page that includes a photo and a "story" of the Sosa family, the principals of PANGEA, to solicit investors.

## **COUNT I - BREACH OF CONTRACT**

45.     Pangea hereby realleges each and every allegation contained in Paragraphs 1 through 44 as if fully set forth herein.

46.     The Agreement was a valid and binding contract between PANGEA and Defendants.

47.     PANGEA fully performed its material obligations under the Agreement at all relevant times herein.

48.     Defendants materially breached the Agreement by failing to provide PANGEA with a marketable product to distribute within the Probation Period and by misrepresenting Defendants' compliance with the applicable federal regulations on imported food products, as per the terms of the Agreement.

49.      Furthermore, Defendants materially breached the Agreement by failing to cure their breach and misrepresentations once Plaintiff put them on notice of the defects. Specifically, Defendants failed to cooperate with Plaintiff's efforts to obtain federal compliance in order to perform under the Agreement.

50.     Pursuant to the terms of the Agreement, Pangea is entitled to receive from Defendants the total amount invested, plus 15% for intangible losses.

51.     Pangea seeks recovery of the restitution it is entitled pursuant to the Agreement.

52.     As a direct and proximate result of Defendants' actions, Pangea has been and continues to be irreparably injured and has sustained significant damages in an amount to be determined by the evidence at trial.

53.     Such conduct on the part of Defendants has caused and will continue to cause irreparable injury to Pangea unless it is enjoined.

## COUNT II – FRAUDULENT INDUCEMENT

54.     Pangea hereby realleges each and every allegation contained in Paragraphs 1 through 44 as if fully set forth herein.

55.     This is a claim for fraudulent inducement.

56.     Defendants made false statements regarding material facts, including the Defendants products' compliance with the applicable U.S. federal regulations, including the data contained in the labels, and the quality of Defendants' products. Specifically, Defendants stated in Section 5.11(b) of the Agreement that they had obtained approvals from the Food and Drug Administration (FDA), which controls the importation of food products into the U.S. Furthermore, Defendants confirmed that they had maintained those registrations in good standing and were currently active at the time of entering into the Agreement.

57.     In addition, Defendants falsely represented to Plaintiff that the labels and technical information placed on the products were compliant with U.S. regulations and that the products were ready to be marketed in the U.S. market.

58.     Defendants knew that the products were not compliant with U.S. applicable regulations as Defendants had not contacted the agencies for approval, nor had their data sheets or labels evaluated by accredited professionals in the U.S.

59.     Defendants intended that these representations induce Plaintiff to invest and work on Defendants' project.

60.     Relying on Defendants' representations, Plaintiff entered into the Agreement with Defendants and justifiably invested a large amount of money and resources in furtherance of the terms of the Agreement.

61.     As a direct and proximate result of Defendants actions, Pangea has been, and continues to be, damaged by Defendants' activities and conduct.

### COUNT III – CIVIL CONSPIRACY TO COMMIT FRAUD AS TO ROBERTO SEMINARA AND FABRIZZIO PECCI

62.     Pangea hereby realleges each and every allegation contained in Paragraphs 1 through 44 as if fully set forth herein.

63.     Defendants ROBERTO SEMINARA and FABRIZZIO PECCI conspired to defraud PANGEA.

64.     At all times material hereto, Defendant, SEMINARA, and Defendant, PECCI, had full knowledge of the falsehood of their statements in connection with the defects of the products and knew that Plaintiff, through its owners and representatives, would act in reliance of the information presented as part of a formal offer of an investment opportunity.

65.     Defendant, SEMINARA, contacted and pursued Plaintiff's officers to solicit their investment.

66.     Defendant, PECCI, joined Defendant, SEMINARA, on his attempts to defraud Plaintiff, and both SEMINARA and PECCI knowingly, wrongfully, maliciously, intentionally, and tortiously lied about the quality, technical specifications, marketing information and regulatory compliance of the Defendants' products. Specifically, Defendants SEMINARA and PECCI knew that Defendants had not sought FDA approval nor compliance with the applicable federal regulations at the time the

investment opportunity was presented to the Plaintiff.

67.     Defendants have no privilege or justification for their actions and their conduct.

68.     Defendants' actions have proximately caused Plaintiff's damages.

69.     Defendants' actions have irreparably harmed PANGEA.

## COUNT IV – UNJUST ENRICHMENT

70.     Pangea hereby realleges each and every allegation contained in Paragraphs 1 through 44 as if fully set forth herein.

71.     Plaintiff has conferred Defendants the benefit of an investment of $418,000.00, which provided the benefit of obtaining compliance with the applicable U.S federal agencies for Defendants' products, among other advantages.

72.     Defendants voluntarily pursued Plaintiff to invest and confer the aforementioned benefits, and voluntarily accepted and retained said benefits.

73.     As explained before, the circumstances render Defendants' retention of the benefits conferred by Plaintiff's investment inequitable.

74.     Plaintiff is entitled to be paid the total amount of the investment plus the cost of intangible efforts as per the terms of their negotiations.

## COUNT V INVASION OF PRIVACY

75.     Pangea hereby realleges each and every allegation contained in Paragraphs 1 through 44 as if fully set forth herein.

76.     This is a claim for invasion of privacy under Section 540.08, Florida Statutes.

77.    As of the date of this Complaint, Defendants have utilized the name and likeness of PANGEAS principals and owners, Alberto Sosa, Sr., Alberto Sosa, Jr., and the Sosa Family for trade, commercial, and advertisement purposes of their businesses. (See Exhibit C)

78.    Defendants' use of Plaintiff's officers name and likeness is unauthorized.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff Pangea Merx, LLC prays for judgment in its favor and against Defendants C.B.I. SPA; ONLYMOSO HARVEST, LLC; ONLYMOSO U.S.A. CORP; ONLYMOSO U.S.A. MARKETING, LLC; FABRIZIO PECCI; and ROBERTO SEMINARA providing the following relief:

1.    Temporary, preliminary, and permanent injunctive relief prohibiting Defendants, its distributors, retailers, agents, employees, representatives, and all persons acting in concert with it, including, but not limited to, any online platform, such as Amazon.com or eBay.com, or any website, website host, website administrator, domain registrar, or internet service provider, from:

a.    using, or attempting to use, any of Pangea Merx, LLC's intellectual property, including, but not limited to, Pangea Merx, LLC or its copyrighted images;

b.    engaging in any false or misleading advertising with respect to Pangea Merx, LLC or its officers, and their relationship with Defendants, which relief includes but is not limited to removal of all of Defendants' mention of Pangea Merx, LLC's name, or any of

its officers' names, from the Internet, including but not limited to:

www.onlymoso.com; www.onlymoso.com/about/team

c.    advertising, selling, or taking any steps to sell Defendants' products or investment opportunities using Pangea Merx, LLC's, or its officers, likeness trademarks or names;

d.    engaging in any activity constituting unfair competition with Pangea Merx, LLC; and

e.    inducing, assisting, or abetting any other person or entity in engaging in or performing any of the business activities described in the paragraphs above.

2.    An order requiring Defendants to correct any erroneous impression consumers may have derived concerning the nature, characteristics, or qualities of the relationship between PANGEA MERX, LLC and its officers with the Defendants', including without limitation, the placement of corrective advertisement and providing written notice to the public to cure any residual impacts from Defendants' false advertising;

3.    Adjudge Defendants to have materially breached the Agreement and award Pangea liquidated damages in the amount of $418,000.00, the total amount invested plus an additional 15% of the total cost as restitution for intangible cost for a total amount of $ 480,070.00 as permitted by the Agreement;

4.    Adjudge Defendants to have violated Fla. Stats. §§ 540.08 by publishing Plaintiff's officers' name and likeness on the internet and award a reasonable royalty, as well as punitive or exemplary damages, and any other relief this Court deems just and proper;

5.      Award Pangea the costs incurred in bringing this action;

6.      Award Pangea Attorneys' Fees pursuant to Fla. Stats. §§ 540.08 and

Section 9.16 of the Agreement;

7.      Grant PANGEA such other relief as this Court deems just and proper.

## JURY TRIAL CLAIM

Pangea hereby requests trial by jury on all claims so triable.

COHEN LEGAL GROUP, P.A.
Attorney for Plaintiff
1398 SW 160 Ave. Suite 206
Ft. Lauderdale, Florida 33326
Telephone: (954) 617-6500
Primary Email Address:
pleadings@accidentinjurycounsel.com

BY: __ /s/ Michael J. Cohen _____
        MICHAEL J. COHEN
        Florida Bar No. 146358

# Exhibit "A"

## INTERNATIONAL SALES
## AND
## DISTRIBUTION
## AGREEMENT

This **INTERNATIONAL SALES AND DISTRIBUTION AGREEMENT** (hereinafter the "Agreement") is made and entered into as of _16th March 2021_ by and between C.B.I. S.P.A., a corporation duly registered in Italy, and having its offices at Via Raffaello 3-A, 47841 Cattolica (RN), Italy and any and all of its subsidiaries and affiliates involved in the business including but not limited to Onlymoso Harvest, LLC, a duly registered Florida Limited Liability Company, and Onlymoso USA Corp, a Corporation duly registered in the State of Florida, having their offices at 4577 Nob Hill Road, Suite 207, Sunrise Florida 33351, and their respective subsidiaries (hereinafter the "Manufacturer"), and PANGEA MERX, LLC, a corporation duly registered in the State of Florida, having its offices at 4557 North Nob Hill Road, Suite 105, Sunrise, Florida 33351 (hereinafter the "Distributor"). The Manufacturer and Distributor shall hereinafter also be referred to individually as a "Party" and collectively as the "Parties."

### WITNESSETH:

**WHEREAS**, Manufacturer is engaged in the business of manufacturing food products such as snacks, plants, charcoal, culms, and beverages under the brand of BAMBITA, and consequently owns certain intellectual property and proprietary rights, including but not limited to certain European Union trade marks, over the products and its related technology.

**WHEREAS**, the Parties contemplate that Distributor will purchase from Manufacturer certain products on an ongoing basis for distribution in the Territory on its own or through independent parties monitored and supervised by and under direct contract with Distributor, and desire to enter into an Agreement that sets forth the terms and conditions that will govern all ongoing and future transactions as of the Effective Date.

**WHEREAS**, Manufacturer desires to appoint Distributor as its sole and Exclusive distributor with sole and ample powers within the Territory, and Distributor desires to accept this position.

**NOW, THEREFORE**, Manufacturer and Distributor, in consideration of the following mutual covenants and promises, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby agree as follows:

### ARTICLE I: DEFINITIONS

1.1     Business Day. The term "Business Day" shall mean a day on which banks in the United States, are open for business.

1.2     Confidential Information. The term "Confidential Information" means various commercial, marketing, technical and other information and trade secrets considered by the disclosing party to be confidential, and subject to the restrictions on use and disclosure set forth in Section 5 below.

1.3     Effective Date. The term "Effective Date" refers to the date on which this Agreement is executed by duly authorized representatives of each party to this Agreement.

1.4     Inventory. The term "Inventory" shall mean at any time all units of the products (i) in Distributor's inventory, (ii) ordered by Distributor but not yet received by Distributor at such time, or (iii) returned by customers to Distributor within thirty (30) days of such time.

1.5     Orders. The term "Orders" shall refer to purchase orders for Products remitted by Distributor to Manufacturer in the regular course of business.

1.5     Product. The term "Product" shall refer to those items, as described in Section 2 below, for which Distributor issues to Manufacturer an Order during the term of this Agreement.

1.6     Reasonable Price. The term "Reasonable Price" refers to the market value of the Product at the time of delivery.

1.7     Territory. The term "Territory" means those areas with purchasers with a principal place of business in the United States.

1.8     Ample Powers. Distributor retains sole and absolute rights over the distribution efforts within the U.S. which include but it is not limited to unobstructed discretion over marketing, promotional efforts, sales, logistics, and customer support. Manufacturer's rights within the territory, as well as the rights of sub-distributors and any independent buying agent are subordinated to and of minor rights over Distributor's. For clarification, if and when the Manufacturer opens a manufacturing, canning, or other type of facility within the Territory, Manufacturer's distribution rights within the territory shall remain subordinated to and of minor rights over Distributor's within the Territory. In such case, the Manufacturer would be entitled to produce the Products subject to this Agreement within the Territory, however, the Manufacturer would not be entitled to distribute any of the Products subject to this Agreement within the Territory regardless whether the Products are imported, produced, or packed in the Territory.

1.9     Exclusivity. Means that, subject to this Agreement, Manufacturer shall not grant further distribution rights within the Territory or allow any party, including itself or its agents, to import or sell any and all of the Products subject to this agreement to or within the Territory. Distributor shall have the right to enter into further distribution agreements with sub-distributors. Furthermore, Manufacturer shall direct any party interested in selling any of the Products subject to this Agreement in the Territory to contact the Distributor directly. For clarification, this provision, as the rest of this Agreement, is binding upon, and inures to the benefit of, the parties and their respective successors and assigns. For clarification, Exclusivity also means that the Manufacturer's rights within the territory shall be subordinated to and of minor rights over Distributor's in case the Manufacturer opens a manufacturing, canning or other type of facility in the Territory, in which case the Manufacturer would be entitled to produce the Products subject to this Agreement, however, the Distributor shall remain the sole and Exclusive Distributor of such Products within the Territory. AESJ

## ARTICLE II: PRODUCTS

2.1     Product Description. The Products subject to this Agreement shall be described in the attached Schedule A. Upon written agreement of both Parties, the Parties reserve the right to change Schedule A to reflect the ongoing needs of the Parties for purchase and distribution subject to this Agreement. If a change to a schedule is made, the Parties shall both execute the new schedule with their signatures and the date of the change.

2.2     Availability. Manufacturer agrees to make available and to sell to Distributor the Products as Distributor shall order from Manufacturer at the prices and subject to the terms set forth in this Agreement.

2.3     Minimum Volumes. Distributor shall be required to purchase minimum monthly volumes and minimum annual purchase requirements as determined on Schedule A.

2.4     Initial Stocking Order. Distributor shall make an Initial Stocking Order as specified on Schedule A.

2.5     New Products. Manufacturer shall notify Distributor of any new Product created in writing no less than ninety (90) days from when Manufacturer would be ready to fulfill an Order of the new Product. This notice shall allow Manufacturer the time needed to evaluate the marketability of the new Product within the Territory.   The Distributor shall notify the Manufacturer of its election to purchase and distribute the Product within forty-five (45) days from receipt of the notice of new Product provided by Manufacturer. Distributor's election to not distribute the new Product after Manufacturer's notification shall not constitute a waiver of ever distributing such Product. The Distributor retains the right to elect to distribute products it has previously rejected at a later time.

2.6     Discontinued Products. In the event the Manufacturer shall discontinue any Product or declare any Product to be obsolete, Manufacturer shall notify Distributor ninety (90) days in advance of such discontinuation or declaration of obsolescence. Distributor may, at its sole discretion, return all units of such Product then in its inventory to Manufacturer and shall receive a return credit for all discontinued units. Distributor shall have the right to substitute discontinued Products with successor Products within sixty (60) days after receipt of the declaration of obsolescence.

2.7     Products Irrespective of Origin. The Parties hereby confirm that as of the date of execution of this Agreement, Products are being manufactured in Italy and will be exclusively imported into the United States by the Distributor. However, the Parties confirm that the terms and conditions prescribed herein shall apply even if the Products are later produced at a different jurisdiction. i.e. United States. The same terms and conditions, that Manufacturer is entitled to produce but not distribute the Products subject to this Agreement within the Territory, shall apply. Distributor shall remain the sole and Exclusive Distributor of such Products within the Territory when and if Products are later produced within the Territory.

## ARTICLE III: TERM AND TERMINATION

3.1     Term. Unless terminated earlier pursuant to the terms of this section, the term of this Agreement shall be two (2) years following the completion of the Probation Period renewable $A \, \mathcal{E} \, \mathcal{S}\mathcal{S}$

Case 0:21-cv-61297-XXXX   Document 1   Entered on FLSD Docket 06/22/2021   Page 21 of 55

for additional terms by mutual written agreement of the Parties. The Probation Period as stipulated in clause 3.3. below, shall last until December 31, 2019 and the two (2) year Term of this Agreement shall commence immediately thereafter.

3.2     Automatic Renewal. Upon completion of the stipulated minimum volumes, the Term of this Agreement shall automatically renew for subsequent additional terms of two years each.

3.3     Distributor's Ample Powers in Practice. Distributor is the sole importer of record for all Products and shall be the sole party with stocking and inventory powers. Distributor shall maintain at all times a warehouse with inventory present in the Territory ready and able to be dispatched. However, the Parties understand that there may be other buyers, agents, and subordinated distributors who shall interact and buy directly from the Distributor from the moment this Agreement is executed. Specifically, once this Agreement is executed under circumstances where prospective or existing buyers ("Buyers") approach Manufacturer with the intent to acquire Products, Manufacturer shall direct any and all communications to Distributor for Distributor to lead and manage all communications.

3.4     Probation Period. There shall be probationary period in which Manufacturer shall assess the capability of the Distributor to distribute its products and satisfactory serve the existing clients the Manufacturer currently holds in the Territory. The Probation Period shall end on December 31, 2019. Approximately thirty (30) days prior to the expiration of this Probation Period, the Parties shall discuss the possible extension or renewal of this Agreement, which will be based on a mutually acceptable performance objective. However, if during the Probation Period, the Distributor meets the prescribed minimum volumes as stipulated by Exhibit A, this Agreement shall automatically become effective and all terms and conditions prescribed herein shall rule from thereon.

3.4.1     Restitution Damages Probation Period. If Manufacturer decides to cancel the Probation Period without cause while Distributor has duly performed, Manufacturer shall restore Distributor's position with due compensation in an amount equal to the out of pocket investment incurred by Distributor to advance this business opportunity, plus the cost of the existing inventory at the value paid by Distributor (including, but not limited to, product value, logistic cost, import duties and additional fees incurred by handling the product) plus an additional fifteen percent (15%) of the total cost as restitution for intangible cost. The Parties agree that out of pocket investment will include but shall not be limited to cost of inventory, marketing fees, promotional expenses, travel expenses and all other cost incurred to conduct business such as renting warehousing facilities, operational licenses and permits, whereas "intangible cost" shall consist of time, energy and efforts devoted to advance this opportunity. If Distributor stops promoting the Bambita brand or its business of operations during the Probation Period, Manufacturer shall not Restitute Damages and/or any kind of what so ever reimbursements of any type.

3.5     Termination. This Agreement may be terminated upon the following occurrences:

(a) Upon the natural termination of the Agreement as specified in Section 3.1 above;

(b) In the event of a material breach or default as to any obligation hereunder by either Party and the failure of the breaching party to cure such material breach or default within fifteen (15) days after receiving written notice thereof from the nonbreaching party, this Agreement may be terminated by the nonbreaching party by giving written notice of termination to the breaching party, such termination being immediately effective upon the giving of such notice of termination.

(c) In the event of a change of control of the business of any Party, a Party may terminate this Agreement by giving written notice of termination to the other Party, such termination being immediately effective upon the giving of such notice of termination; however, the Parties hereby confirm that if change of control of Manufacturer is triggered by the transfer or conveyance of Manufacturer's business, this Agreement shall remain valid and in effect and both parties shall be responsible to enforce this Agreement with the third party buyer.

(d) Upon the filing of a petition in bankruptcy, insolvency or reorganization against or by either Party, or either Party becoming subject to a composition for creditors, whether by law or agreement, or either Party going into receivership or becoming insolvent, this Agreement may be terminated by the other party by giving written notice of termination to the insolvent party, such termination immediately effective upon the giving of such notice of termination.

3.6   Material Breach shall be considered a breach that is so fundamental to this Agreement that the failure to perform defeats the essential purpose of the contract, goes to the root or essence of the agreement or touches the fundamental purpose of the contract and defeats the object of the parties in entering the contract.

(i)   Material breaches of the Distributor include, but is not limited to, (i) impairment by Distributor of any of Manufacturer's intellectual property rights; (ii) failure of Distributor to make any payments timely and in accordance with this Agreement, etc.;

(ii)   Material breaches of the Manufacturer include, but is not limited to, (i) failure of Manufacturer to provide the Product in accordance with each particular order requested pursuant to this Agreement; (ii) any breach of any covenant, representation, or warranty in this Agreement; or (iii) failure to use best effort to correct wrongs and satisfy its obligation to deliver the Product as specified in Customers purchase orders for three consecutive months.

Upon material breach by either party of its obligations under this Agreement, the other party may terminate the Agreement if the breach remains uncured for more than thirty (30) days after a party gives written notice of the breach, such notice to be effective upon the date of mailing.

3.7 Obligations Upon Termination. Upon termination of this Agreement pursuant to this Article III, the Parties agree to the following:

(a) Payments Owed. Termination of this Agreement shall not affect the obligation of Distributor to pay Manufacturer all amounts owing or to become owing as a result of Products tendered or delivered to Distributor on or before the date of such termination, as well as interest thereon to the extent any such amounts are paid after the date they became or will become due pursuant to this Agreement.

(b) Pending Orders. If an Order from Distributor has been accepted by Manufacturer prior to the date of termination of this Agreement but has not been shipped upon the date of termination, Manufacturer shall fill such Order in accordance with the provisions of this Agreement or cancel the Order and provide monetary refund to the Distributor.

(c) Trademarks. Upon the termination of this Agreement, Distributor shall immediately cease all use of the Trademarks with the purpose of pursuing new sales. Distributor shall retain the right to use the Manufacturer's Trademarks, trade dress and any other necessary supplies that contain the Manufacturer's intellectual property to fulfill orders made before the Termination of this Agreement and commercial commitments entered into before such Termination. Further, Distributor shall have no duty to enforce any of the Manufacturer's intellectual property rights. It is the Manufacturer's sole responsibility, and right, to enforce its proprietary and ownership rights, as well as to collect any marketing material that displays, uses or contains any of the Manufacturer's intellectual property assets, including but not limited to the Manufacturer's Trademarks, from all agents within the Territory including but not limited to the sub-distributors the Distributor had engaged under this Agreement.

(d) Limitation of Liability. Manufacturer shall not be liable to Distributor, and Distributor shall not be liable to Manufacturer, or to any other person solely by reason of the termination of this Agreement, including, but not limited to, direct, indirect, special, consequential or incidental damages sustained by reason of such termination. Nothing shall restrict either Party's rights to damages in the event of wrongful termination or a material breach of this Agreement by the other Party.

## ARTICLE IV: SALES PROVISIONS

4.1     Issuance of Orders. Distributor may issue Orders to Manufacturer from time to time. Each Order shall contain a description of the Products ordered, the quantities and prices, production schedule the terms and place of delivery and the following notation: *"This Order is issued pursuant and subject to the International Sales and Distribution Agreement between Distributor and Manufacturer dated [DATE]."* Every Order issued by Distributor to Manufacturer following the Effective Date and bearing such a notation shall be governed by this Agreement. In the event of any inconsistency between the terms and conditions of this Agreement and the terms of an Order, the terms and conditions of this Agreement shall prevail.

4.2     Invoices. Manufacturer's invoices shall contain the following information: (1) Distributor's Order number, (2) description of the Product shipped, and (3) quantity of Product shipped and unit price applicable to the Product.

4.3     Packing. All items shall be suitably packed, marked, and shipped as designated by

Distributor or, in the absence of such a designation, in accordance with the requirements of common carriers and federal and state regulators, in a manner to secure lowest transportation cost, and custom and regulatory clearance, no additional charge shall be made to Distributor.

4.4 Price. The prices for all to be supplied Products shall be negotiated and agreed upon in writing between the Manufacturer and Distributor annually on January 1st of each calendar year. The prices of the Products shall remain the same for the entire year term unless otherwise agreed upon by Manufacturer and Distributor in writing. Prices shall be memorialized in writing in the Orders, which shall also contain all terms and conditions of each sale. In case that no price is set for the Product, the price shall be a reasonable price, as defined in Section 1 (g), at the time for delivery, pursuant to the open price terms of the Uniform Commercial Code, Section 2-305. In case the market value is in dispute, the Parties agree to submit the Product to a valuation to determine the reasonable price. See Exhibit A.

4.5 Payment Terms.

(a) Amounts Due. All amounts due and payable with respect to Product delivered by Manufacturer shall be paid in full within seven (7 business days) days after date of invoice covering such Product. Whenever any amount hereunder is due on non-Business Day, such amount shall be paid on the next such Business Day. Amounts hereunder shall be considered to be paid as of the day on which funds are received by Manufacturer or into Manufacturer's account. No part of any amount payable to Manufacturer hereunder may be reduced due to any counterclaim, set-off, adjustment or other right which Distributor might have against Manufacturer, any other party or otherwise.

(b) Payment Method. All payments made pursuant to this Agreement shall be paid and remitted in Euros. All payments for Orders of Products shall be remitted by Distributor, in Euros, to OnlyMoso USA Corp. on behalf of Manufacturer. All payments shall be made by wire transfer, to such bank or account as Manufacturer may from time to time designate in writing. The Parties agree to use letters of credit only if necessary and agreed upon by both Parties in writing. The binding and final product price shall be the one stipulated in the Purchase Order and Invoice. However, if by the time the Products are ready to leave Manufactures warehouse or facility to the export port, there is a negative currency fluctuation affecting Distributor's margins, exceeding five percent (5%) of the purchased value, such difference shall be equally covered by both parties by compensating such fluctuation to future orders. In the event the fluctuation affecting the exchange rate doesn't come back to normality, Parties agree to sit down and negotiate terms for future Orders to establish a Reasonable Price.

(c) Interest Rate on Past Due Payments. All amounts due and owing to Manufacturer hereunder but not paid by Distributor on the due date thereof shall bear interest at the rate of the lesser of: (1) an interest rate of .0173425% daily, or the most recent interest rate as established by Florida's Chief Financial Officer pursuant to Sections 55.03(1), 215.422(3)(b), 337.141(3) and 687.01, Florida Statutes; and (2) the maximum lawful interest rate permitted under applicable law. Such interest shall accrue on the balance of unpaid amounts from time to time outstanding from the date on which portions of such amounts become due and owing until payment thereof in full.

(d) Default. In the event that Distributor is in default of its obligations to

Manufacturer with respect to payment of amounts due as provided in this Section, all further shipments of Product may be curtailed or delayed until payment has been brought up to date, at the sole and absolute discretion of Manufacturer, in addition to any other action that Manufacturer may take, as deemed appropriate in Manufacturer's sole and absolute discretion.

4.6     Delivery. Manufacturer shall expend its best efforts to conform to the mutually agreed delivery terms for Products ordered pursuant to this Agreement, as follows:

(a) Delivery Time. Manufacturer shall have four (4) to seven (7) weeks after Distributor places the Order to have Products ready for immediate delivery. See Exhibit A.

(b) Failure of Delivery. In the event of failure of delivery on the delivery date, Distributor will give Manufacturer written notice of delay allowing Manufacturer thirty (30) days to cure after receiving such notice. If Manufacturer fails to deliver within the allotted 30 day grace period, Manufacturer will be considered in in default of its obligation under this Agreement.

(c) Risk of Loss. Unless otherwise specified in connection with a particular Order placed pursuant to this Agreement, risk of any loss or damage to the Products shall pass from Manufacturer to Distributor when goods are delivered as specified in the Order, except for loss or damage resulting from Manufacturer's fault or negligence.

(i) If the product is defective or not suitable for consumption, Manufacturer shall be responsible to compensate and fully restore Distributor.

(ii) If Product is suitable for consumption but there are issues with the packaging, labeling or other ancillary aspects of the product, Distributor shall remedy the situation and shall invoice Manufacturer for the cost incurred in remedying the wrongs (ex: change or replace labels, compensation to final buyers, etc.). Manufacturer shall have thirty (30) days from the date of the invoice to pay Distributor back.

(iii) If the wrong is triggered by Distributor, Distributor shall absorb the cost of fixing such wrong.

(d) Delay. Manufacturer shall notify Distributor immediately of any circumstances that may cause a delay in delivery stating the estimated period and reasons for delay and, if requested by Distributor, shall use additional effort to avoid or minimize delay to the maximum extent practicable. In spite of any other provisions of this Agreement, if shipment cannot be or is not made within thirty (30) days after the date scheduled on any Order, Distributor may, upon knowledge of the fact and whether or not the delay would be excusable as provided below, either (i) terminate the Order by written notice to Manufacturer and, in spite of any other provisions of this Agreement, the termination shall be without cost to Distributor and shall discharge all obligations and liabilities of the Parties under the order except as to Products delivered previously or (ii) Distributor may elect to proceed with the current order and shall be entitled to receive a credit on the next order from Manufacturer in the amount of 5% of the value of the order under default. In the event the Delay affecting Deliveries happens more than 3 times in one calendar year, Parties agree to sit down and negotiate terms for future deliveries to establish a Reasonable delivery procedure. In the event Distributor causes any delay bigger than three business

days, Manufacturer will be entitled to receive a compensation/penalty from Distributor of 5% of the value of the delayed Order.

    4.7    Inspection. Manufacturer shall inspect and test all Products prior to shipment to Distributor based on the principle that sales transaction is conducted on an "Exwork basis".

    4.7.1 Visual Inspections: Distributor will inspect the general conditions of the Products; it cannot and it shall therefore not be responsible for tasting the conditions of all Products. Therefore, the merchantability of the Product may be discovered after the inspection period has passed by. If there are issues with the Products after the inspection period, and Distributor needs to restore its clients, Distributor shall be entitled to get indemnification from Manufacturer.

    (a) Acceptance. Notwithstanding any prior payment or inspection by Distributor, all Products shall be subject to final inspection and acceptance by Distributor at Distributor's facility in the City of Miami, State of Florida, United States of America, or in accordance with quality control standards to be agreed upon by Distributor and Manufacturer. Final inspection and acceptance or rejection will be made by Distributor within ten (10) days after receipt of Products at Distributor's warehouse facility, and failure of Distributor to reject any Product within ten (10) days after receipt shall constitute acceptance. Furthermore, if an external, independent inspector needs to be hired to evaluate the conditions of the Product, the cost shall be equally covered by both Parties. However, if the inspector determines the Products have issues of merchantability, Manufacturer shall absorb not only cost of the replacing goods but also the inspectors' fees.

    (b) Rejection. Should Distributor reject any Product for failure to conform to the requirements of an Order, Distributor shall notify Manufacturer of the rejection, giving detailed reasons for the rejection. Rejected items to be returned to Manufacturer shall be shipped at Manufacturer's expenses or Manufacturer, at its own discretion, may elect to have Distributor destroy the products.

    4.8    Large Orders. In instances where a final client's order exceeds ten (10) containers, Distributor and Manufacturer shall discuss and agree in writing on the timeline of production and schedule of delivery before committing to the order. Furthermore, for large orders, prices shall be updated and reduced based on purchased volume so that both final client and Distributor obtain a benefit from purchasing larger volumes.

## ARTICLE V: DISTRIBUTION PROVISIONS

    5.1    Appointment. Subject to the terms and conditions of this Agreement, Manufacturer hereby appoints Distributor on an exclusive basis as its Exclusive distributor with ample powers and rights within the Territory, for the sale of the Products listed in Schedule A, during the term of this Agreement.

    5.2    Distributor's Powers. The appointment of the Distributor shall preclude Manufacturer from the following: A F M

(a) Appointing any other individual, legal person or any other business entity as its Distributor for the sale of the Product in the Territory;

(b) Supply, either by itself or through an agent, any Product to any other person in the Territory, including but not limited to the agents, brokers or sellers that the Manufacturer or any of its agents engaged before the execution of this agreement within the Territory;

(c) Sell the Product on the internet (online) in the Territory; or

(d) Supply any of the Products to any other person outside the Territory if the Manufacturer knows, or should reasonably know, that they are intended for resale in the Territory.

The Parties hereby covenant that there are existing clients/agents/brokers/sellers in the Territory which are currently buying directly from Manufacturer, a list of said existing clients/agents/broker/sellers in the Territory is attached hereto as **Exhibit E**. Upon execution of this Agreement, Manufacturer shall within five (5) days notify said existing clients/agents/brokers/sellers in the Territory about the execution of this Agreement and that they shall purchase the Products and deal directly with only the Distributor forthwith. As such, Distributor shall be entitled to service these clients and absorb them as its own.

Furthermore, any additional client that will arise after the execution of this Agreement shall be solely served by Distributor

5.3     Territory. Manufacturer is appointing Distributor hereunder with respect to the importation, distribution and resale of Products to any purchasers in the United States of America.

5.4     Sales Outside Territory. The rights of distribution granted to the Distributor hereunder shall extend only to the Territory. Distributor agrees that it will not make any use, nor permit, authorize or sublicense any use of the rights granted hereunder where such usage will or might extend beyond the Territory. Distributor shall refer to Manufacturer all inquiries concerning purchases of the Products for delivery outside the Territory.

5.5     Sub-Distributors. Distributor shall, at its own discretion, have the right to appoint sub-distributors or sales representatives within the Territory with the aim to promote the sale of the Product. Written consent of the Manufacturer is not required to effectively appoint such sub-distributors. This provision establishes the right of the distributor to effect its obligations and responsibilities by the use of sub-distributors and sales representatives.

5.6     Independent Contractors. The Parties to this Agreement are each independent contractors, and no Party shall make any representations or statements indicating or suggesting that any joint venture, partnership, employment or other such relationship exist between the Parties.

5.7     Expenses. Except as otherwise set forth herein, each party shall be responsible for all expenses incurred in connection with the implementation of this Agreement, including without limitation: salaries, office and travel expenses, advertising, trade shows, and any and all taxes imposed on that party. Δ ε 55

5.8     Best Efforts. In addition to the terms and conditions of this Agreement, the Parties agree to use its best efforts to promote and market the Products to the maximum number of customers in the Territory. Distributor's Failure to use best efforts shall constitute a material breach of this Agreement.

5.9     Distributor's Obligations.

(a) Representations. Distributor hereby represents and warrants to Manufacturer that, as of the Effective Date: (i) it is qualified and permitted to enter into this Agreement and that the terms of this Agreement do not conflict with and are not inconsistent with any other of its contractual obligations; (ii) it is validly existing and in good standing as a corporation under the laws of the United States of America, and has all necessary corporate power to perform its obligations under this Agreement and its financial resources are sufficient to enable it to perform all of its obligations under this Agreement; (iii) it has sufficient personnel and capacity to perform its obligations under this Agreement; and (iv) it owns or controls sufficient rights for it to perform its obligations under this Agreement.

(b) Storage. Distributor shall store the Products in accordance with the storage specifications that Manufacturer will provide in writing, and in accordance with all applicable laws, rules and regulations in the Territory. The Parties understand that Products need to be stored in a ventilated warehouse facility.

(c) Distribution and Shipping. Distributor shall import, distribute and ship the Products within the Territory in accordance with Manufacturer's packaging, shipping, and distribution specifications for the Products that Manufacturer will provide in writing, and in accordance with all laws, rules, and regulations in the Territory. If a particular Product requires a different storage and/or logistic handling, Manufacturer shall inform with specificity.

(d) Expired Products. Distributor shall not sell any Product with an expired shelf life, and shall dispose of any such expired Product in the manner required by Manufacturer, and in accordance with all laws, rules, and regulations in the Territory.

(e) Branding. Distributor agrees to assume all marketing, promotional and sales efforts. Specifically, Distributor will be responsible for strategizing, designing and implementing all promotional campaigns including but not limited to branding, social media, marketing campaigns, etc. Manufacturer retains veto power to comment on the course taken but such power shall not be construed to become conditional approvals before launching any form of campaign. The branding shall be used by Distributor in the Territory. If Manufacturer wants to utilize such branding campaign in other markets, the Parties shall agree the terms and conditions of such limited branding right.

(f) Records. Distributor shall maintain all necessary records for compliance with all laws, rules, and regulations in the Territory. Distributor shall not be required to provide Manufacturer with a report of Distributor's sales, retail store nor wholesale operations. In addition, Distributor is not bound to report to Manufacturer any developments concerning the promotion and sale of Products in the Territory, the status of customers and potential customers, important changes in marketing potential nor other aspects of the sale of

Products in the Territory. The Parties agree that such reports and related information are confidential.

(g) Office, Facilities and Organization. Distributor shall maintain a reasonable sales organization and reasonable administrative and distribution facilities capable of handling promptly and efficiently all purchase requests and capable of supplying the Product to the Territory as required by this Agreement.

(h) Complaints. Distributor shall reasonably advise Manufacturer promptly of any information which may come to Distributor's attention as to charges, complaints or claims about Manufacturer or the Products.

(i) Compliance with Law. Distributor shall act in full compliance with all applicable laws, ordinances, regulations, and other requirements, if any, of any and all governmental authorities asserting jurisdiction and shall obtain and maintain all permits, licenses and other consents necessary for the performance of Distributor's duties under this Agreement.

(j) Labeling and Regulatory Requirements. Distributor shall provide to Manufacturer the appropriate language for all labels, tags, packaging, and other items associated with or attached to the Products. Furthermore, Distributor shall inform Manufacturer of labeling and other regulatory requirements with respect to the importation and sales of the Products in the Territory in accordance with applicable laws. Labeling shall be printed in Italy and installed in the Products prior to shipment and Manufacturer shall bear all costs related to the labels. Notwithstanding the forgoing, Distributor shall cover only the cost of such labeling changes or updates required for the Products to be sold in the Territory. However, Distributor reserves the right to assess and recommend alternative printing methods, if so merits, and if the recommended alternative printing methods increase the price of printing the labels, the Parties shall negotiate and agree in writing to new terms or prices related to the recommended changes made to the labels. If the changes to the label, recommended by the Distributor determine products to be stopped at customs when entering the Territory, Distributor will be responsible for all relative cost/damages.

(k) Customs Clearance. Distributor shall be responsible to obtain all necessary clearances of the Products through customs. Manufacturer shall provide such assistance as may be reasonably required by Distributor.

(l) Goodwill. Distributor will at all times conduct its business in a manner as will reflect favorably on Manufacturer and Manufacturer's Product and will not engage in any deceptive, misleading, illegal, or unethical business practice. Distributor will not offer or sell the Manufacturer's merchandise outside Distributor's area of distribution and will refer all inquiries regarding potential customers outside Distributor's area of distribution to Manufacturer. Distributor will not design, manufacture, or market, nor will it act as a representative or distributor for, any products that compete with the Manufacturer's merchandise. Distributor will disclose to Manufacturer the identities of all products and manufacturers that it distributes or represents and will notify Manufacturer of contemplated additions prior to making new commitments.

(m) <u>Government Approvals.</u> Distributor shall take all steps required by any local, provincial, national, or regional agency, government or commission to obtain the necessary licenses, permits, approvals, franchises or authority to carry out its obligations hereunder in compliance with applicable law in the Territory.

(n) <u>Taxes.</u> Distributor represents and warrants that all Products purchased from Manufacturer are for resale in the ordinary course of Distributor's business, and that Distributor has complied and/or will comply with applicable laws and rules relating to the billing, collection and/or payment by Distributor of sales, use, franchise and all other taxes applicable to all such resale transactions.

(o) <u>Qualified Personnel</u>. Hire a Manager or management company with fifteen (15) to twenty (20) years of experience or similar and reasonable experience in the food industry within the Territory.

5.10   Manufacturer's Obligations

(a) <u>Assistance.</u> Manufacturer shall provide Distributor with such marketing and technical assistance and free Product samples as Manufacturer may in its discretion consider necessary to assist with the promotion of the Products. Manufacturer shall provide, in its discretion, appropriate field technical assistance to Distributor and Distributor's customers during special events and/or trade fair. The Parties hereby confirm that half a pallet of each Product shall be given as "Sample" at a discounted rate of thirty percent (30%) of the original value for promotional and marketing purposes, not sale related.

(b) <u>Training.</u> Manufacturer shall provide Product launch training to Distributor's personnel in connection with the marketing, sale, maintenance, and support of the Products. Training should be done online when possible. Alternatively, if training needs to be done at Manufacturer's facility, Manufacturer shall (a) pay all related costs for accommodations or (b) provide accommodations in one of the hotels owned by the Manufactures subsidiaries, affiliates or owners, Manufacturer also agrees to pay and provide meals during the entire training period. Distributor shall pay for all cost related to transportation from the United States to Manufacturer's facility.  However, if training could be done in the U.S., Manufacturer shall bear the cost of the trip exclusively.

(c) <u>Supply.</u> Manufacturer undertakes to supply to Distributor such Products as Distributor orders subject to the terms of this Agreement and any Order. Manufacturer shall not force Distributor to purchase any specific Product. Distributor retains absolute discretion to decide which Products to purchase for distribution in the Territory.

(d) <u>Product Changes.</u> Manufacturer may change the line of Products to be offered in the Territory at any time, upon Distributor's written consent. Distributor reserves the right to cancel the Order for changed Products irrespective of whether the changes are minor or significant.  Such cancellation must be within thirty (30) business days after notification is received by Distributor of such changes.

(e) <u>Price Fluctuation as of Manufacturer Origin.</u> Manufacturer shall give the Distributor not less than sixty (60) days' notice in writing of any alteration in the price of the Product. The altered prices shall only apply to Products to be delivered after the applicable date of the increase; it shall not include Products already delivered or outstanding orders.

(f) <u>Advertising.</u> If so required by Distributor on its sole discretion, Manufacturer shall make available to Distributor any existing and already created promotional materials, photographs, catalogs, posters and other advertising materials in digital format (which shall be the original source files that are in vector formatting and high resolution), utilized by Manufacturer to promote the sales of the Product. Distributor retains absolute discretion to determine whether or not such material is appropriate and/or applicable to the Territory.

(g) <u>Compliance with Law.</u> Manufacturer shall act in full compliance with all applicable laws, ordinances, regulations, and other requirements, if any, of any and all governmental authorities asserting jurisdiction and shall obtain and maintain all permits, licenses and other consents necessary for the performance of Manufacturer's duties under this Agreement.

(h) <u>Italy Government Approvals.</u> Manufacturer shall take all steps required by any local, provincial, national, or regional agency, government or commission to obtain the necessary licenses, permits, approvals, franchises or authority to carry out its obligations hereunder in compliance with applicable law in Italy in order to comply with the applicable laws for the Products to be distributed in Italy and to be able to be exported towards the Territory.

5.11    <u>Government Approval.</u> Where necessary, each Party shall be required to obtain all governmental approvals required to fulfill its obligations under this Agreement.

(a) <u>Burden of Compliance.</u> The laws of each country relative to the distribution of products are different. The burden for complying with such laws should properly fall on the Distributor with regards of the laws of the United States. The burden of complying with such laws should properly fall on the Manufacturer with regards to the laws of Italy. The Distributor shall be responsible for the laws regarding distribution in all countries in the Territory.

(b) <u>Condition Precedent.</u> The Parties hereby confirm that Manufacturer has obtained approvals from the Food and Drug Administration (FDA) which controls the importation of food products into the U.S. Approvals relate to facilities producing the products, ingredients and the final food produce. Furthermore, Manufacturer hereby confirms that is has maintained those registrations in good standing and are currently active. If approval by any governmental entity in any country in the Territory is required before this Agreement is enforceable, then such government approval is a condition precedent to the validity of this Agreement. There may be instances where permits or other types of government approval are required prior to the commencement of sales in a particular country. Under this provision, the Parties cannot enforce its rights under this agreement until these permissions are obtained.

(c) <u>Material Changes.</u> In the event that any governmental entity requires material changes to be made to the terms of this Agreement or the relationship between the Parties, either party may terminate this Agreement upon thirty (30) days' written notice to the other party. This protects either party against a restructuring of the basic business deal if ordered by a particular government or country.

(d) <u>Local Laws.</u> The Parties shall work together in complying with local laws on their respective countries. The Distributor shall be responsible for the laws regarding distribution in all countries in the Territory. There may be instances where information is required from the local representatives to fulfill certain government obligations. This provision contractually obligates both parties to comply and facilitate the compliance of such laws.

5.12  <u>Insurance.</u> During the term of this Agreement, and for one (1) years thereafter, Manufacturer and Distributor each shall maintain at all times at their sole cost and expense the insurance coverages set forth on Exhibit "D". All such insurance shall be issued by one or more insurance carriers licensed or approved to do business in the state and/or country where services are rendered, or Products distributed.

## ARTICLE VI: TRADE SECRETS, CONFIDENTIALITY AND NONCIRCUMVENTION

6.1  <u>Confidential Information.</u> This Agreement and all data, literature and information in any form, not in the public domain, that is disclosed by one party to the other within the scope of this Agreement, including intellectual property rights and or business trade secrets such as clients information, shall be considered confidential information ("Confidential Information") of the owner of such rights for the duration of this Agreement and thereafter, whether or not it is expressly marked "confidential" (or any similar marks) and shall not be revealed or transferred by the recipient to any other person, third party, company or otherwise without the prior written authorization of the owner, nor will the owner be considered to have relinquished any of its rights in the Confidential Information at any time by a disclosure within the scope of this Agreement. All Confidential Information shall remain confidential during the duration of this Agreement and for three (3) years following the date the disclosing party reveals such information.

6.2  <u>Preservation of Confidentiality.</u> Each party shall keep confidential, and not disclose to others, or take or use for its own purposes any Confidential Information of the other including but not limited to identity of: suppliers, sales representatives, vendors, clients, buyers, and sellers introduced by any of the Parties or their affiliates. All Confidential Information remains the Disclosing Party's property and, upon the Disclosing Party's written request, shall be returned or destroyed.

6.3  <u>Disposal of Confidential Information.</u> All Confidential Information shall be either destroyed or returned to its owner or originator, at the election of such owner or originator upon the termination of this Agreement.

6.4  <u>Exception of Confidentiality.</u> Preservation of Confidentiality does not apply to information that: (a) is or becomes generally known through no action or failure to act by the receiving party; (b) the receiving party knows at the time of disclosure; (c) a third party legitimately discloses to the receiving party; or (d) the receiving party independently develops without using the other party's Confidential Information.

6.5   Limited Disclosure. (1) A receiving party may: (a) disclose the item only to employees who need to know; and (b) may use the item only for the sole purpose of advancing the interest of this Agreement; (2) A receiving party shall not: (a) disclose the item to any third party, except to the extent disclosure is compelled by law; (b) contact directly third Parties introduced by Distributor, known through Distributor's efforts, or discovered through meetings, conversations, e-mail communications with third Parties; and (c) reproduce the item.

6.6   Continuing Duty of Confidentiality. Confidential Information shall remain confidential during the duration of this Agreement and for three (3) years following the date the disclosing party reveals such information.

6.7 Non-Circumvention. The Parties hereby agree not to do business with any of the revealed contacts without the written consent of the introducing party. In case of circumvention, the Parties agree and guarantee that they will pay legal monetary penalty that is equal to the commission, fee or monetary gain the circumvented Party should have realized in such transaction. Non-Circumvention limitations shall remain confidential during the duration of this Agreement and for three (3) years following the date the disclosing party reveals such information. This non-circumvention limitation and all other clauses related to this Agreement shall apply to both Manufacturer and Distributor, its directors, shareholders, affiliates, subsidiaries, etc. Notwithstanding the foregoing, absent any subsequent written agreement between the Parties in the event that Distributor elects to voluntarily terminate its Agreement with Manufacturer, this Non-Circumvention provision shall not be applicable to Manufacturer after the effective date of the voluntary Termination of this Agreement by Distributor.

## ARTICLE VII: WARRANTY

7.1   Warranty. Manufacturer warrants to Distributor that all Products delivered under an Order shall be free from defects in materials and workmanship, that all Products will conform to the requirements of the Order including, but not limited to, the applicable descriptions, specifications, and drawings that shall have been agreed to by the Parties and, to the extent the items are not manufactured pursuant to detailed designs furnished by Distributor, that (a) all items will be free from defects in material, workmanship, design; (b) will be suitable for the intended purpose of human consumption; (c) will comply with all applicable laws and regulations required in the Territory for such purpose; (d) will be of the described quality; (e) within the average variations of fungible products of good quality, will be of even kind, quality and quantity within each unit and among all units delivered to Distributor; (f) will be adequately contained, packaged and labeled as per the terms of this Agreement; and (g) will conform to the promises or affirmations of fact made on the containers or labels, including but not limited to the Nutritional Information. The warranty period shall extend to final acceptance by Distributor or Distributor's customer in accordance with the final acceptance test procedures as mutually agreed between Distributor and Manufacturer, whichever occurs last.

THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE.

7.2     Warranty Claim. Upon receipt of any warranty claim that is made in a timely and prompt fashion, Manufacturer shall make reasonable efforts to correct any significant reproducible error in the Product, provided such error relates to the proper functioning of the Product and has not been caused by negligence on the part of Distributor or its sub-distributors or sales representatives or any third party, computer malfunction, or other causes external to the Product. Manufacturer's liability is limited to replacement of Product.

## ARTICLE VIII: INTELLECTUAL PROPERTY RIGHTS

8.1     Title. Manufacturer retains title and all associated rights to its intellectual property, including trademarks, trade names, copyrights and patents, and any modifications or improvements made thereto. Such intellectual property may not be copied, removed, disguised, or changed in any form by Distributor. This intellectual property includes, at a minimum, Product packaging and associated markings, advertising or marketing materials, and manuals. Distributor will not obtain any rights in the Product as a result of its responsibilities under this Agreement.

8.2     Exclusive Rights. Distributor acknowledges Manufacturer's exclusive rights in the Product and that the Product is unique and original to Manufacturer and that Manufacturer is the owner thereof. Unless otherwise permitted by law, neither Distributor nor any of its sub-distributors or sales representatives shall, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, Manufacturer's exclusive right and title to the Product or the validity thereof. Neither Distributor nor any of its sub-distributors or sales representatives shall have any right to duplicate, translate, decompile, reverse engineer, or adapt the Product without Manufacturer's prior written consent, nor shall they attempt to develop any products that contain the "look and feel" of any of the Product.

8.3     Trademarks.

(a) Use of Trademarks. Manufacturer authorizes and grants a limited, royalty-free, exclusive license to Distributor to use the trademarks, in all present forms and future variations, in connection to the sale and promotion of any and all Products subject to this Agreement (the "Trademarks") in the Territory for the purpose of exercising Distributor's rights and performing Distributor's obligations under this Agreement. Distributor shall ensure that each reference to and use of any of the Trademarks is in a manner that does not harm the Manufacturer, the Products, their established goodwill and their reputation.

(b) Registration of Trademarks. Manufacturer gives the Distributor the right to represent its Trademarks in the Territory. Distributor shall be registered as the only party with sole right to utilize the brand in the Territory. The Distributor acknowledges that the Manufacturer is the owner of the Trademarks and that the Manufacturer retains all ownership rights on the Trademarks subject to the exclusive license granted pursuant to this International Sales and Distribution Agreement. All usage of the Manufacturer's name and Trademarks shall inure to the success of the Parties in fulfilling their obligations and exercising their rights under this Agreement. The Distributor has the right, but not the obligation, to apply to register the Mark, in all present forms and future variations used in connection to any and all Products subject to this Agreement, as a trademark or service mark, as the case may be, with any or all state and federal authorities within the Territory.

The Manufacturer may cooperate with the Distributor to sign all documents, provide adequate specimens and information, and to take all steps reasonably necessary to allow the Distributor to represent the Mark as so determined. The Distributor shall retain all ownership rights on any and all marketing material created solely by the Distributor to promote the products the Distributor is offering for sale, including the Products subject to this agreement, if said marketing material does not contain the Manufacturer's Trademarks or intellectual property.

(c) Termination. Upon termination or expiration of this Agreement, Distributor shall immediately cease any use of the Trademarks to pursue new sales, shall refrain from displaying any material bearing the Trademarks and shall deliver to Manufacturer, free of charge other than the Products that are subject to the buy-back provisions as provided in this Agreement, any products or material bearing the Trademarks which are in its possession or under its control. Distributor shall retain the right to use the Trademarks in commerce in the ordinary course of business to fulfill orders that precede the date of termination of the Agreement.

Furthermore, Distributor will deliver to Manufacturer all administrative control over social media channels originally created by Distributor using the Manufacturer's Trademarks or intellectual property as well all marketing and labeling created for Products' promotion. Manufacturer shall compensate the Distributor with the 55% of the increase of valuation on social media accounts and domain names used in the Territory. The increase valuation compensation shall be based on the reports of three expert auditors on social media and domain names. The auditors shall be (a) one appointed by the Manufacturer, (b) one appointed by the Distributor and (c) one neutral.

## 8.4     Copyrights.

(a) Use of Copyright. Manufacturer authorizes and grants a limited, royalty-free, exclusive license to Distributor to use original authorship materials, such as photographs, text, audiovisual works, digital designs, labels, etc., in all present forms and future variations, in connection to the sale and promotion of any and all Products subject to this Agreement (the "Copyrighted Material") in the Territory for the purpose of exercising Distributor's rights and performing Distributor's obligations under this Agreement. Distributor shall ensure that each reference to and use of any of the Copyrighted Material is in a manner that does not harm the Manufacturer, the Products, their established goodwill and their reputation.

(b) Ownership of Original works of Authorship. The Distributor shall retain all ownership rights on any and all original works of authorship created by the Distributor, or any of its agents or affiliates, to promote the products the Distributor is offering for sale, including the Products subject to this agreement, if said work does not contain the Manufacturer's intellectual property. The Distributor acknowledges that the Manufacturer is the owner of the Copyrighted Material and that the Manufacturer retains all ownership rights on such content subject to the exclusive license granted pursuant to this International Sales and Distribution Agreement. All usage of the Manufacturer's original works of

authorship shall inure to the success of the Parties in fulfilling their obligations and exercising their rights under this Agreement.

(c) Termination. Upon termination or expiration of this Agreement, Distributor shall immediately cease any use of the Manufacturer's Copyrighted Material to pursue new sales, shall refrain from displaying any material bearing the Manufacturer's Copyrighted Material and shall deliver to Manufacturer, free of charge other than the Products that are subject to the buy-back provisions as provided in this Agreement, any products or material that contain the Manufacturer's Copyrighted Material which are in its possession or under its control. Distributor shall retain the right to use the Manufacturer's Copyrighted Material in commerce in the ordinary course of business to fulfill orders that precede the date of termination of the Agreement. Furthermore, Distributor will deliver to Manufacturer all its Copyrighted Material. Distributor shall retain all ownership rights in any all material originally created by Distributor.

## ARTICLE IX: MISCELLANEOUS

9.1     Entire Agreement. This Agreement, including all exhibits and schedules attached hereto, constitutes the entire agreement between the Parties, and supersedes all prior negotiations and agreements between the Parties concerning its subject matter.

9.2     Non-Solicitation. During the term, of this Agreement and for a period of three (3) year following the termination of this Agreement, neither Party shall directly or indirectly encourage, induce, recruit, solicit or take away, or attempt to solicit or take away, any employee of the other Party.

9.3     Force Majeure. Neither party shall be liable to the other for any failure to perform or delay in performance required under this Agreement due to acts of law, including governmental bodies acting pursuant to law, acts of God, strikes, lockouts or other labor disturbances, acts of the public enemy, wars, insurrections, riots, lightning, fires, floods, civil disturbances, explosions, breakage or accidents to machinery, or any other cause, whether of the kind enumerated in this Section or otherwise, not reasonably within the control of the party claiming inability to perform. The affected party shall use all possible diligence to remove the force majeure condition as quickly as possible, but it is understood that settlement of strikes, lockouts or other labor disturbances shall be entirely within the discretion of the party having the difficulty. In the event that either Distributor or Manufacturer is unable, wholly or in part, by reason of force majeure to carry out its obligations under this Agreement, other than the obligation to make payment of amounts owing pursuant to this Agreement at the time of such force majeure which payments shall not be excused as a result of such force majeure condition, such party shall give written notice of such force majeure to the other party as soon as reasonably practicable and the obligations of both parties, other than the obligation to make payment of amounts accrued and owing, so far as such obligations are affected by such force majeure, shall be suspended during the continuation of any inability so to perform.

9.4     Notice. All notices, demands, requests or other communications required or permitted under this Agreement or by law shall be in writing and deemed duly served on and given (i) when delivered personally; (ii) ten (10) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; (iii) upon delivery by fax with written facsimile; (iv) email confirmation; or (v) one (1) day after deposit with a commercial overnight carrier, with written verification of receipt. Such notices shall be in writing and delivered to the address set forth below, or to such other notice address as the other Party has provided by written notice.

To Manufacturer:     C.B.I. S.P.A.
Via Raffaello 3-A, 47841 Cattolica (RN), Italy
Attn: Fabrizio Pecci / Antonio Imperiale
E-mail: fabriziopecci@gmail.com / foodexport@cbispa.it

Onlymoso USA Corp,
4577 Nob Hill Road, Suite 207, Sunrise Florida 33351
Attn: Roberto Seminara
E-mail: roberto@onlymososales.com

Onlymoso Harvest LLC,
4577 Nob Hill Road, Suite 207, Sunrise Florida 33351
Attn: Roberto Seminara
E-mail: roberto@onlymososales.com

*With a copy to:*
Santucci Priore, PL
200 South Andrews Avenue
Fort Lauderdale, Fl 33301
Attn: Joseph V. Priore
E-mail: jpriore@500law.com

To Distributor:     PANGEA MERX, LLC
4557 North Nob Hill Road, Suite 105, Sunrise, Florida 33351
Attn: Alberto E. Sosa
E-mail: aesosa@windmillgrp.com

*With a copy to:*
Oppenheim Pilelsky, P.A.
2500 Weston Road, Suite 404, Weston, FL 33331
Attn: Geoffrey E. Sherman, Esq.
Email: geoffrey@oplaw.net

9.5     Waiver/Severability. The delay or failure by either party to exercise or enforce any of its rights under this Agreement shall not constitute or be deemed a waiver of that party's right thereafter to enforce those rights, nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

9.6     Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute but one and the same instrument. A facsimile or electronic transmission of a signed original shall have the same effect as delivery of the signed original.

9.7     Headings. The titles to the sections of this Agreement are solely for the convenience of the Parties and shall not be used to explain, modify, simplify, or aid in the interpretation of the provisions of this Agreement.

9.8     Interpretation/Jurisdiction/Venue/Governing Law.

(a)  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, United States of America, without giving effect to conflict of law rules. The Parties expressly agree to exclude the application of the U.N. Convention on Contracts for the International Sale of Goods (1980) to this Agreement and the performance of the Parties contemplated herein, to the extent that such convention might otherwise be applicable.

(b)  All disputes concerning the validity, interpretation, or performance of this Agreement and any of its terms or provisions, or of any rights or obligations of the parties hereto, will be governed by and resolved in accordance with the laws of the State of Florida. The Parties consent to the exclusive jurisdiction of the state courts and U.S. federal courts located in Broward County, Florida for any dispute arising out of this Agreement. The parties consent to the jurisdiction and venue of the foregoing courts and consent that any process or notice of motion or other application to any of said courts or a judge thereof may be served inside or outside the State of Florida or the Southern District of Florida by registered mail, return receipt requested, directed to the party being served at its address set forth on the notice provision to this Agreement (and service so made shall be deemed complete three (3) days after the same has been posted as aforesaid) or by personal service or in such other manner as may be permissible under the rules of said courts. Each of the parties hereto irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding brought in such a court and any claim that suit, action, or proceeding has been brought in an inconvenient forum.

(c)  Appointment of Agent of Service of Process. C.B.I. S.P.A., a corporation duly registered in Italy, hereby irrevocably appoints Joseph V. Priore of 200 South Andrews Avenue Fort Lauderdale, Fl 33301, U.S.A. ("SOP Agent") as its agent for the receipt of service of process in the United States. C.B.I. S.P.A. agrees that any document may be effectively served on it in connection with any action, suit or proceeding in the United States by service on its agents. Distributor consents and agrees that C.B.I. S.P.A. may, in its reasonable discretion, irrevocably appoint a substitute agent for the receipt of service of process located within the United States, and that upon such appointment, the

appointment of SOP Agent may be revoked.

(c1)  Appointment of Agent of Service of Process. Onlymoso USA Corp., a corporation duly registered in Florida, USA, hereby irrevocably appoints Joseph V. Priore of 200 South Andrews Avenue Fort Lauderdale, Fl 33301, U.S.A. ("SOP Agent") as its agent for the receipt of service of process in the United States. Onlymoso USA Corp. agrees that any document may be effectively served on it in connection with any action, suit or proceeding in the United States by service on its agents. Distributor consents and agrees that Onlymoso USA Corp. may, in its reasonable discretion, irrevocably appoint a substitute agent for the receipt of service of process located within the United States, and that upon such appointment, the appointment of SOP Agent may be revoked.

(c2)  Appointment of Agent of Service of Process. Pangea Merx, LLC., a corporation duly registered in Florida, USA, hereby irrevocably appoints Geoffrey E. Sherman, Esq of Oppenheim Pilelsky, P.A. 2500 Weston Road, Suite 404, Weston, FL 33331, U.S.A. ("SOP Agent") as its agent for the receipt of service of process in the United States. Pangea Merx, LLC. agrees that any document may be effectively served on it in connection with any action, suit or proceeding in the United States by service on its agents. Manufacturer consents and agrees that Pangea Merx, LLC. may, in its reasonable discretion, irrevocably appoint a substitute agent for the receipt of service of process located within the United States, and that upon such appointment, the appointment of SOP Agent may be revoked.

Any document shall be deemed to have been duly served if marked for the attention of the agent at its address as set forth in this Section 9.8(b) or such other address in the United States as may be notified to the party wishing to serve the document and (i) left at the specified address if its receipt is acknowledged in writing; or (ii) sent to the specified address by post, registered mail return receipt requested. In the case of (i), the document will be deemed to have been duly served when it is left and signed for. In the case of (i), the document shall be deemed to have been duly served when received and acknowledged.

If C.B.I. S.P.A.'s agent at any time ceases for any reason to act as such, such C.B.I. S.P.A. shall appoint a replacement agent having an address for service in the United States and shall notify the Parties of the name and address of the replacement agent. The provisions of this Section 9.8(c) applying to service on an agent apply equally to service on a replacement agent.

9.9     Dispute Resolution.
(a) Informal negotiation. Prior to the initiation of and as a precondition to mediation or litigation as detailed below, the parties shall first attempt to resolve their dispute informally. The parties will use their best efforts to arrange personal meetings and/or telephone conferences as needed. Each negotiator will have the authority to negotiate and enter into a settlement of the dispute. If any dispute cannot be resolved within 5 business days, then either party may initiate mediation.

(b) <u>Mediation</u>. Each party agrees that as a precondition to the initiation of litigation for any dispute arising from or in connection with this Agreement, litigation shall not be commenced until the procedures set forth in this Paragraph 9.9 have been exhausted. In the event of any controversy or claim arising from or in connection with this Agreement or the breach, termination, or validity thereof, except for temporary, preliminary, or permanent injunctive relief or any other form of equitable relief, that is not settled through informal dispute resolution under Paragraph 9.9(a), either party (referred to for convenience in this Paragraph 24(b) as the "Delivering Party") shall notify the other (referred to for convenience as the "Receiving Party") in writing of the dispute, specifying such dispute in reasonable detail and stating a date, time and place and name of mediator for the nonbinding mediation of the dispute (the "Mediation Notice"). The Receiving Party shall respond to the Mediation Notice in writing within 5 business days, either accepting the date, time and place proposed or rejecting such proposed date, time and place. The parties shall promptly attempt to set a mutually acceptable date, time and place and name of mediator for the mediation of the dispute. In the event that the parties are unable to set a mutually acceptable date, time and place and name of mediator for the mediation of the dispute within 5 business days after the Receiving Party responds to the Mediation Notice, then either party may initiate litigation.

9.10    <u>Indemnity</u>. Distributor agrees to defend, indemnify, and hold Manufacturer, and its officers, directors, agents, and employees, harmless against all costs, expenses, and losses (including reasonable attorney fees and costs) incurred through claims of third Parties against Manufacturer based on Distributor's breach of any representations or warranties contained herein or as a result of any of Distributor's actions or inactions. Manufacturer agrees to defend, indemnify, and hold Distributor, and its officers, directors, agents, and employees, harmless against all costs, expenses, and losses (including reasonable attorney fees and costs) incurred through claims of third Parties against Distributor based on Manufacturer's breach of any representations or warranties contained herein or as a result of any of Manufacturer's actions or inactions.

9.11    <u>Infringements</u>. Distributor agrees to notify Manufacturer promptly in the event Distributor and its sub-distributors and sales representatives become aware of any infringements of the Manufacturer's proprietary or intellectual property rights. Manufacturer shall have the right, in its sole discretion, to prosecute lawsuits against third Parties for infringement of Manufacturer's rights in the Product.

Distributor and its sub-distributors and sales representatives agree to fully cooperate with Manufacturer and its representatives in the prosecution of any such suit. Manufacturer and Distributor shall equally bear the expenses incurred as a result of such legal proceeding. Manufacturer and Distributor shall equally be entitled to any recovery received as a result thereof, whether by adjudication or settlement.

9.12    <u>Assignment</u>. Neither party shall have the right to assign this Agreement without the prior written consent of the other party, provided that either party shall have the right to assign this Agreement to any person or entity that acquires or succeeds to all or substantially all of such party's business or assets upon written notice to the other party.

9.13    <u>Agreement Binding on Successors</u>. This Agreement shall be binding on and shall

inure to the benefit of the Parties hereto, and their heirs, administrators, successors, affiliates companies, subsidiaries, holdings, and assigns.

9.14    Modification or Amendment to this Agreement. Neither this Agreement nor any incorporated writing may be modified or amended except by the mutual written agreement of the Parties. No waiver of any provision of this Agreement shall be effective unless it is in writing and signed by the party against which it is sought to be enforced. Any additional modification must be in writing and executed by both parties to become binding.

9.15    Independent Contractors. The relationship of the Parties hereunder shall be that of independent contractors. Nothing herein shall be construed to constitute a partnership between or joint venture of the Parties, nor shall either party be deemed the agent of the other or have the right to bind the other in any way without the prior written consent of the other.

9.16    Attorney's Fees. Each party shall bear the cost of its own attorney's fees in preparation of this Agreement. In the event any party to this Agreement shall commence any action or proceeding against another party that arises out of the provisions hereof, or to recover damages as the result of the alleged breach of any of the provisions hereof, the prevailing party shall be entitled to recover reasonable attorneys' fees and all reasonable costs and expenses incurred in connection therewith, including fees and costs incurred in connection with the exercise of the right to appeal.

9.17    Language. All communications relating to this Agreement shall be in English. Any documents submitted in any other language shall be accompanied by an English translation, unless otherwise agreed to in writing by the Parties.

9.18    Preparation of Agreement and Legal Representation. EACH OF THE PARTIES HERETO HAS BEEN REPRESENTED OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED BY LEGAL COUNSEL OF THEIR OWN CHOICE WITH RESPECT TO THE MATTERS CONTAINED HEREIN, AND TO THE EXPRESSED AND UNEXPRESSED CONSEQUENCES OF SIGNING THIS AGREEMENT THE PARTIES HERETO FURTHER AGREE THAT THIS AGREEMENT HAS BEEN FULLY NEGOTIATED AMONG THEMSELVES, AND THAT IN THE EVENT OF ANY AMBIGUITY, NO PRESUMPTION CONSTRUING THE AGREEMENT AGAINST ONE PARTY OR THE OTHER SHALL BE IMPOSED BECAUSE OF THE FACT THAT THE FINAL DRAFT WAS PREPARED BY ONE PARTY OR THE OTHER.

**BY SIGNING BELOW, THE PARTIES REPRESENT THEY HAVE READ THIS INTERNATIONAL SALES AND DISTRIBUTION AGREEMENT, AND UNDERSTAND AND AGREE WITH ALL OF ITS TERMS AND CONDITIONS.**

IN WITNESS WHEREOF, the undersigned Parties have duly executed this INTERNATIONAL SALES AND DISTRIBUTION AGREEMENT at Miami, Dade County, Florida, effective as of this 1 day of March, 2019, AESS

FOR AND BEHALF OF:

PANGEA MERX, LLC.

By: _Alberto E Sass_

Printed Name: _A_

Title: Manager

Date: March/16/2019.

C.B.I. S.P.A.

By: _FABRIZIO Fecci_

Printed Name:

Title: President _& RO_

Date:

OnlyMoso Harvest, LLC

By: _____

Printed Name:

Title: President

Date:

OnlyMoso USA Corp

By: _Roberto Seminara_

Printed Name:

Title: President _CEo_

Date: _16th March 2019_

Witnessed by:

By: _____
Printed Name: _____

By: _____
Printed Name: _____

Witnessed by:

By: _____
Printed Name: _____

By: _____
Printed Name: _____

Witnessed by:

By: _____
Printed Name: _____

By: _____
Printed Name: _____

Witnessed by:

By: _____
Printed Name: _____

By: _____
Printed Name: _____

## EXHIBIT A

### This is an EXHIBIT A SAMPLE not final!

1. Products

| Product # | Product Name | Price Per Unit | Product Description |
|---|---|---|---|
| 401 | Sautéed shoots with parsley & garlic. | 2,70 Euros Exwork Ravenna Port. | Small Jars (200 gr) |
| 402 | Bamboo shoots with oregano | 2,70 Euros Exwork Ravenna Port. | Small Jars (200 gr) |
| 403 | Bamboo Pesto a la Genovese. | 2,70 Euros Exwork . Ravenna Port. | Small Jars (200 gr) |
| 404 | Bamboo sprouts Cream. | 2,70 Euros Exwork Ravenna Port. | Small Jars (200 gr) |
| 405 | Candied Bamboo | 2,70 Euros Exwork Ravenna Port. | Small Jars (200 gr) |
| 406 | Bamboo sprouts with Truffle y and pepper. | 2,70 Euros Exwork Ravenna Port. | Small Jars (200 gr) |
| 407 | Natural Bamboo shoots. | 15,20 Euros Exwork Ravenna Port. | Large Jars (1.500 gr) |
| 408 | Sautéed shoots with parsley & garlic. | 15,20 Euros Exwork Ravenna Port. | Large Jars (1.500 gr) |
| 409 | Bamboo shoots with oregano | 15,20 Euros Exwork Ravenna Port. | Large Jars (1.500 gr) |
| 410 | Bamboo sprouts with Truffle y and pepper. | 15,20 Euros Exwork Ravenna Port. | Large Jars (1.500 gr) |
|  | Bamboo Pesto a la Genovese. | 15,20 Euros Exwork Ravenna Port. | Large Jars (1.500 gr) |

2. <u>Initial Stocking Order</u> – Distributor's Initial Stocking Order shall be as follows:

> Two forty foot containers
> One 20 foot containers
> Plus everything Roberto has in the wharehose
> Plus 16 mixed cases

3. <u>Minimum Product Order</u> – Distributor's minimum quantities per Order for each Product shall be as follows:

Verify numbers with Roberto and verify info is correct.

| Product Name | Price Per Unit | Number of Units to Order |
|---|---|---|
| Pesto<br>Small Jars (200 gr) | 2,70 Euros Exwork Ravenna Port | 20,000 or 11 pallets<br>(2,016 unidades 1 palleta) |
| Cream<br>Small Jars (200 gr) | 2,70 Euros Exwork Ravenna Port | 20,000 or 11 pallets<br>(2,016 unidades 1 palleta) |
| Sautéed<br>Small Jars (200 gr) | 2,70 Euros Exwork Ravenna Port | 8,500 or _____ pallets<br>(2,016 unidades 1 palleta) |
| Trufa y Pimienta<br>Small Jars (200 gr) | 2,70 Euros Exwork Ravenna Port | 8,500 or _____ pallets<br>(2,016 unidades 1 palleta) |
| Salteados<br>Large Jars (1.500 gr) | 14.95 Euros Exwork Ravenna Port | 5,000 or _____ pallets |
| Trufa y Pimienta<br>Large Jars (1.500 gr) | 14.95 Euros Exwork Ravenna Port | 5,000 or _____ pallets |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

4. <u>Estimated Logistic Costs & Freight from Italy to Miami, U.S.</u>

   usd 6.000 20 feet y entre usd 7000 to 8000 el de 40 pies

5. <u>Payment Method</u>.  Irrevocable Letter of Credit.

6. <u>Delivery Timeline</u>. 4 to 7 weeks from time order has been placed.

7. <u>Minimum Volumes.</u> Distributor shall purchase during each year of this Agreement at least the minimum amounts of the merchandise as follows:

    a. Year 2019 or Probation period:
- Initial and stocking order:
    1. 2 forty foot containers.
    2. 1 twenty foot container.
    3. Plus everything Roberto has in the warehouse
    4. Plus 16 mixed cases given to Gustavo

    b. Year 2020:
- First semester: 6 forty foot container.
- Second semester: 18 forty foot container.

    c. Year 2021 and following years: 10 container per month.

Pangea Merx, LLC and C.B.I. S.P.A.,
International Sales and Distribution Agreement
Page 29 of 33

## EXHIBIT B

Branding and Marketing Expenses Per Month During Probation Period

| DATE | TYPE OF SERVICE | VALUE PAID |
|------|-----------------|------------|
|      |                 |            |
|      |                 |            |
|      |                 |            |

Note: Upon termination, Distributor will deliver all material to Manufacturer upon receiving full compensation for the cost incurred plus an additional fifteen percent (15%) as stipulated in Clause____

Pangea Merx, LLC and C.B.I. S.P.A.,
International Sales and Distribution Agreement
Page **30** of **33**

## EXHIBIT C

Below are the administrative codes to manage all marketing platforms.

| PLATFORM | USERNAME | PASSWORD |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |



Pangea Merx, LLC and C.B.I. S.P.A.,
International Sales and Distribution Agreement
Page 31 of 33

## EXHIBIT D

### INSURANCE REQUIREMENTS

*Manufacturer and Distributor must maintain the following policies of insurance at their own expense:*

**Commercial General Liability Insurance,** on an occurrence basis, including a duty to defend, which must provide coverage for bodily injury and property damage with the following minimum limits of insurance:

- $_____ Each Occurrence Limit

- $_____ Personal and Advertising Injury Limit

- $_____ Products and Completed Operations Liability

- $_____ Aggregate Limit

The policy must contain a contractual liability coverage extension, either within the policy form or by endorsement. The policy must contain a Vendors Endorsement (CG2015) naming the other party, as applicable, and their respective parent, subsidiaries and affiliated entities, and its and their officers, directors and employees as additional insureds.

**Workers' Compensation Insurance** covering all statutory benefits in the states of operation and **Employers' Liability,** with limits of at least $_____ per accident or disease.

**Business Auto Liability Insurance,** with minimum combined single limits of $_____ per accident for bodily injury and property damage. The policy must include a duty to defend and cover all owned, non-owned, and leased or hired vehicles.

**Commercial Umbrella/Follow Form Excess Insurance,** with minimum limits of $_____ per occurrence and in the aggregate, in excess of the underlying policy limits. The policy must provide coverage at least as broad as the underlying policies and provide coverage excess of the required general liability, employer's liability, and automobile liability coverages.

**Product Recall Insurance,** with minimum limits of $_____ per occurrence. The policy must provide coverage for expenses associated with recalling products affected by Seller. The policy must include coverage for accidental contamination, malicious contamination, product rehabilitation and loss of gross profits.

**The following additional requirements shall apply:**

- Insurance must be placed with insurance companies rated at least A, X (10) by the A.M. Best.

- All liability policies must be endorsed to name the other party and their respective parent, subsidiaries and affiliated entities, and its officers, directors and employees as additional insured utilizing ISO forms.

- The automobile liability, general liability and workers' compensation policy, if permitted by law, must have a waiver of subrogation in favor of the other party and their respective parent, subsidiaries and affiliated entities, and its officers, directors and employees.

- All insurance policies must apply as primary and non-contributory with respects to operations of Buyer. Seller will bear any losses within insurance deductibles or self-insured retention amounts.

- All insurance policies must be written on a per occurrence basis except for Product Recall Insurance which is written on a limit of liability basis.

- All insurance policies must be endorsed to provide the other party with _____ days advance written notice of cancellation or material change in coverage.

**Evidence of Insurance:**

- Prior to the Effective Date, each party hereto shall deliver to other a certificate, executed by a duly authorized representative of each insurer, showing compliance with the insurance requirements set forth above.

- Policy renewal dates must be noted, and new certificates must be provided, meeting the requirements noted above, throughout the entire Term.

- Failure of any party to demand such certificate or other evidence of full compliance with these insurance requirements or failure of any party to identify a deficiency from evidence that is provided shall not be construed as a waiver of the other party's obligation to maintain such insurance.

- Certificates with disclaimers must have Additional Insured endorsement(s) attached.

**The insurance requirements set forth herein are minimum coverage requirements and are not to be construed in any way as a limitation on a party's liability under this Agreement.**

**Failure to maintain the required insurance may result in termination of this Agreement in accordance with its terms.**

## EXHIBIT "E"

List of existing clients/agents/broker/sellers in the Territory

The list shall include the following information for each client/agent/broker/seller in the Territory:

| | |
|---|---|
| **Name** | |
| **Company Name** | |
| **Street Address** | |
| **City** | |
| **State** | |
| **Zip Code** | |
| **E-mail Address** | |
| **Telephone** | |
| **Type: (Client/Agent/Broker/Seller)** | |
| **List of Products Purchased:** | |
| **Amount of Products Purchased** *please include details for each Product* | |
| **Date Products Purchased Last** | |
| **Purchase Price for Products –** *please include details for each Product* | |
| **Is There a Written Agreement with the Manufacturer or Affiliate of Manufacturer as to Purchase Price or Compensation?** *(if Yes, please provide copy)* | |





# Exhibit "B"



# Exhibit "C"



The Sosa's have an international family business with more than 45 years of experience in real estate, 6 years in the import/export industry, 20 years in hospitality, food service, catering and event planning.

Alberto Sosa's father, in the early nineties, founded a marmalade, or jam, company called "La Cuisine." Several years later he got into the export business; he was exporting several products from ceiling lamps to water bottles to the United States.

The Sosa family, now lead by three sons and supervised by father and mother Sosa, decided to start a new distribution, import, and export company based in Florida. In 2016 Pangea Merx, LLC was founded.

In March 2019, led by Albert E. Sosa (son), after long negotiations, Pangea Merx LLC signed the "Bambita International Sales Agreement." The agreement gave Pangea Merx control over the food import and distribution of the "Bambita" brand for the U.S. territory. Bambita is the first brand in the world to offer vegan bamboo shoots and products of high quality and delicious taste. Today with the experience of the entire family, the fresh approach of new generations, and with the perfect partners and associates, Pangea Merx will lead the way for Bambita's products. This will give Americans the opportunity to have high quality and healthy bamboo products as part of their diet.

**THE SOSA'S**
United States Food Distribution Division